Marian WARD, Plaintiff,

v.

SHONEY'S, INC., Defendant.

C.A. No. 98C–09–032–JRS.

Superior Court of Delaware.
New Castle County.

Submitted: May 1, 2002.
Decided: June 24, 2002.

Andrew G. Ahern, III, Esquire, Joseph W. Benson, P.A., Wilmington, Delaware. Attorney for Plaintiff.

Colin M. Shalk, Esquire, Casarino, Christman & Shalk, Wilmington, Delaware. Attorney for Defendant.

SLIGHTS, J.

## I. INTRODUCTION

In this case, the Court is called upon again to fulfill its responsibility as "gatekeeper" to ensure that expert testimony proffered for presentation at trial is relevant and reliable. The expert testimony in question here principally involves so-called "human factors" engineering, loosely defined as "the study of how humans act and react in certain situations."[1] The plaintiff in this trip-and-fall personal injury action, Marian Ward, seeks to offer the testimony of a civil/structural engineer with experience in human factors engineering to support the proposition that the defendant, Shoney's, Inc. ("Shoney's"), negligently designed the walkway and adjoining landscaping leading into its restaurant by failing to anticipate that the landscaping, in certain circumstances, could constitute a tripping hazard. Specifically, the expert would testify that Shoney's should have anticipated that patrons intentionally would depart from the walkway and enter the landscaping when rounding the corner of the restaurant. According to the expert, the raised edging separating the landscaping from the sidewalk was a dangerous condition of which Shoney's should have been aware.

Shoney's has moved *in limine* for an order excluding the expert's testimony on the ground that it is not competent under D.R.E. 702. While Shoney's motion implicates a well-settled standard of review, grounded in seminal Federal and developing Delaware authority,[2] the application of this standard of review to the testimony *sub judice* is complicated by the nature of the testimony itself. Plaintiff's expert has offered nothing by way of published or even anecdotal support for his opinions.

---

1.  *See Honeycutt v. KMart Corp.*, 1 S.W.3d 239, 244 (Tex.App.1999). *See also Zavala v. Powermatic, Inc.*, 167 Ill.2d 542, 212 Ill.Dec. 889, 658 N.E.2d 371, 374 (1995)(expert defined "human factors engineering" as "a study of the relationship of man to machinery, including human motor coordination and reaction time"); *Parker Drilling Co. v. O'Neill*, 674 P.2d 770, 778 (Alaska 1983)("human factors" defined as "the study of human behavior with respect to equipment and working environment, and the attempt to modify conditions in the workplace to eliminate 'induced human errors' ").

2.  *See Daubert v. Merrell Dow Pharm. Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)(spawning Federal and Delaware progeny).

Instead, his opinion derives solely from his own experience designing structures to accommodate anticipated human behavior, and general references to the similar experiences of others in his field.

In most instances, the failure to support an expert opinion with measurable foundation would render the opinion *per se* inadmissible. Yet this expert correctly observes that his opinion is not animated by laboratory science or precise standards of engineering, but rather by the peculiarities of human behavior in particular circumstances. According to the plaintiff, the Court cannot expect a study, regulation, standard, guideline or protocol to address every aspect of human behavior in every situation. She contends that in the field of human factors engineering, the Court must permit the expert, in certain instances, to draw solely upon his training and personal experience while constructing his opinions. And implicit in the plaintiff's argument is the notion that to require more foundation from the human factors expert would be tantamount to a blanket exclusion of experts in this field from Delaware courtrooms. It is this potential outcome that has caused the Court to step especially carefully through the *Daubert* analysis.

For the reasons stated below, the Court has concluded that Shoney's motion *in limine* must be **GRANTED**. The subjective opinions of the expert, without more to support them, are unreliable and, consequently, inadmissible. Because the plaintiff has failed to support her claim of negli-

gence with competent expert testimony, the Court has no choice but to enter summary judgment in favor of Shoney's.

## II. *FACTS*

### A. The Accident

On September 19, 1996, Ms. Ward fell outside a Shoney's Restaurant owned and operated by defendant, Shoney's. Her complaint alleges that Shoney's negligently maintained the walkway surrounding its restaurant. The parties do not dispute for present purposes that Ms. Ward tripped and fell after she stepped off the walkway which ran along the exterior of the restaurant and entered a landscaped area which ran adjacent to the walkway.[3] Ms. Ward was on her way to purchase a newspaper from a vending machine located just outside the entrance of the restaurant. As she approached the entrance of the building, she departed from the paved walkway while rounding the corner of the restaurant. She tripped on the raised edging that separated the landscaping from the sidewalk. It is undisputed that she intended to walk through the landscaping to "cut the corner",[4] i.e., she intended to take a "short cut."[5]

Plaintiff's negligence case has been pared down to two claims: (1) Shoney's was negligent for failing to anticipate that pedestrians would "cut the corner" through its landscaping; and (2) Shoney's negligently maintained a "raised edge"

---

**3.** A diagram of the area appears in Judge Quillen's decision on defendant's motion for summary judgment. *See Ward v. Shoney's, Inc.*, Del.Super., C.A. No. 98C–09–032, Quillen, J., 2000 WL 303311 (Feb. 24, 2000)(hereinafter *"Shoney's I"*)(Letter Op. at 2).

**4.** This characterization has been used by the parties to describe Ms. Ward's conduct. It will be adopted by the Court for purposes of this opinion.

**5.** Shoney's would dispute these facts at trial. According to Shoney's, Ms. Ward has denied that she tripped in the landscaping. Eyewitnesses claim she did trip while walking in the landscaping. In any event, for purposes of the motion *sub judice*, both parties have assumed that Ms. Ward tripped while attempting to take a short cut from the prescribed path leading into the restaurant.

along the border of the landscaping in a manner which created a tripping hazard for pedestrians who did "cut the corner."

## B. The Human Factors Expert's Opinion

Judge Quillen already has determined that plaintiff cannot sustain a *prima facie* case of negligence absent expert support for her claims.[6] At the time Judge Quillen reached this conclusion, plaintiff already had engaged her engineering expert. It appears that Plaintiff engaged David H. Fleisher, P.E. some time prior to June 1, 1999. According to his written report of that date, Mr. Fleisher conducted a site inspection of the area outside the Shoney's restaurant and reviewed the complaint, plaintiff's interrogatory answers, an incident report prepared by Shoney's, a letter from plaintiff's counsel, notes from a private investigator engaged by plaintiff's counsel and photographs of the scene. Based on this investigation, he opined that:

- The landscape edging was a trip hazard and a cause of the this accident.
- Certain landscape edging was visible to pedestrians walking along the side of Shoney's Restaurant toward the front.
- Conditions outside of this restaurant were available to distracted [sic] the attention of pedestrians walking along the side of the building towards the front.

Mr. Fleisher gave his first discovery deposition on June 14, 1999. He opined that Shoney's should have anticipated that pedestrians entering and leaving its restaurant would "cut the corner" through the landscaping. Based on this well-known propensity of human behavior, Mr. Fleisher opined that the raised edging which separated the walkway and the landscaped area constituted a dangerous condition of which Shoney's should have been aware.

In connection with its motion for summary judgment, Shoney's argued that Mr. Fleisher's opinion was incompetent and should be disregarded. Judge Quillen rejected the argument in the context of the motion for summary judgment but allowed that "defendant can again challenge the admissibility of the expert's opinion at trial if it so elects."[7] Judge Quillen observed that Mr. Fleisher's "[deposition] testimony was particularly short on the practice within the restaurant and related businesses [with respect to the maintenance of edging between sidewalks and landscaping]," and that "[t]he testimony may look less probative in the context of the full evidence."[8]

Excerpts from the Fleisher deposition reveal the origin of Judge Quillen's concerns regarding the starkness of his opinions:

Q. Was there anything else about this area that was misleading (referring to the witness' previous characterization of the accident site) in some way?

A. I think that the misleading part of this is that the anticipation that people are going to cut corners negated the use of this type of material along this area. And that the edge of the sidewalk should have been used as a retention devise for the mulch in the bed. And the bed should have been appropriately ad-

---

6. *Shoney's I,* supra, (Letter Op. at 2–3)("It is simply difficult for a lay factfinder to draw the inference that Shoney's was negligent from the fact that it used raised landscape edging, a very common practice").

7. *Id.* at 3.

8. *Id.*

justed to accommodate that.[9]

* * *

Q. Okay. To your knowledge, is there any publication upon which you relied to establish that the landscaping edging should not have been as it was at Shoney's Restaurant on September 19, 1996?

A. Yes.

Q. And what publication would that be?

A. Pedestrian Falling Accidents in Transit Terminals.[10]

* * *

Q. Okay. And what is it about this publication that fits the situation here?

A. The clearance between the bottom of footwear and a walking surface establishes height of objects which are tripping hazards.

Q. Could you just read the two pages, what portion of that report says that?

A. [ ] "Both the heel strike and the push-off are the points in the walking cycle when a person is likely to trip. Tripping would likely occur when the leg is swung forward and there is insufficient ground clearance for the foot. Minimum ground clearance of the toe when the foot is swung forward were observed to average 0.6 inches in range between three-eighths and one-and-one-half inches in one controlling study.[11]

* * *

Q. [ ] Is there any publication which states that there may not be landscape edging of any height, whether it be one inch, two inches or as the inches are in this case, upon which you relied?

A. Not that I'm familiar with at this time, at this particular location, for this particular situation.

Q. Are there any peer reviews in the sense that other people within the area of civil engineering, architecture, landscape architecture, landscape engineering, and peer reviews which are published or state in any publication, that which you're aware, that there cannot be landscape edging of the height the landscaping involved in this incident that we've been talking about for the last couple hours?

A. Not that I'm presently familiar with as it applies to the specific arrangement where the incident occurred in front of this restaurant.

Q. Are You Aware Of Any Scientific Or Technical Theories In Any Field, Whether It Be Architecture, Engineering, Civil Engineering, Or Any Scientific Theory Published Or Written, Which States That There May Not Be Landscaping Of The Type Used At The Shoney's Restaurant, The Type We've Been Talking About Here For The Last Several Hours That Says That?

A. You're referring specifically to the landscape edging. It's my position that it's recognized that people tend to cut corners, and that this was a corner that was known ahead of time that people cut. I observed, during my examination, people cutting this corner. And it's something that Shoney's should have anticipated. As such, this particular material was not properly used at this particular point. Although

9. Fleisher Depo. at 99 (June 14, 1999).

10. *Id.* at 102.

11. *Id.* at 103–04.

there might be good applications for this material, this was not, in my view, a safe application of the material where somebody was going to cut corners. And since you know that people are going to be cutting corners here, and you know what the required clearance is from ground to footwear, and I've produced the materials for you which demonstrate that, this is a tripping hazard. And the landscape edging should not have been there. It should have been eliminated.

Q. I understand that, but the question was a little more simple than that. Are you aware of any scientific publications in any fields which share that opinion?

A. I am not currently aware of that. You're talking about experience and knowledge of human characteristics.

Q. Are you aware of any tests or experiments by others in the scientific or technical community which support the proposition that you assert that there should not be landscaping in the area as it was in the Shoney's Restaurant in September of 1996?

A. Again, the same answer. This is a pretty isolated thing that normally would not be written about or studied, but I think it's something that is recognized within the practices of engineering that people do tend to cut corners, like this, especially right in front of this particular restaurant. And that having an edge projecting higher than the sidewalk imposes a tripping hazard on peo-

ple, since that is something that the people tend to do.

Q. Then, you are not aware of any writings which would so support your opinion?

A. Not presently.

Q. You're not aware of any studies which would support your opinion?

A. I cited one already. (Referring to the Pedestrian Falling Accidents in Transit Terminals study).[12]

* * *

Q. Okay. Well, you seem to be saying that, based on your experience, people should know, that is, Shoney's should know that people cut corners. If people cut corners, there shouldn't be landscape edging with a lip. Is there anything Shoney's could have looked at to support that opinion? I mean, could it have looked at BOCA codes? Could it have looked at a publication? Could it have looked at an architectural guide or a publication? Could it have looked at regulations? Could it have looked at a treatise? Could it have looked at a book? Could it have looked at anything to say, before you got involved in this case, that this is not the appropriate thing to do?[13]

A. I'm not familiar with something that they could have looked at. I think it's based upon engineering experience and judgment.

Q. Your engineering experience and judgment?

A. Yes. That's what I base my opinions on.[14]

---

12. *Id.* at 104–08.

13. Although Dr. Seuss-like in its cadence, this lengthy question clearly is intended to query whether Mr. Fleisher's opinions could find any support, specific or general, in the uni-

verse of references typically utilized by experts to sustain their opinions.

14. *Id.* at 110–11.

Judge Quillen concluded *Shoney's I* by providing a deadline by which Mr. Fleisher could supplement his report in advance of trial.[15] The new deadline was clearly the Court's invitation to the plaintiff to invigorate Mr. Fleisher's theretofore languid effort to find support for his opinion. Plaintiff declined the Court's invitation; Mr. Fleisher did nothing.

At a status conference in August, 2001, Shoney's again expressed its view that Mr. Fleisher's expert opinion was not admissible. The Court advised the parties of its preference that the matter be addressed in advance of trial and, on September 7, 2001, set forth a schedule by which Shoney's renewed motion would be submitted to the Court for consideration.[16] After considering the papers submitted, the Court asked the parties to supplement the record with sworn testimony from Mr. Fleisher addressing the following questions:

1. The specific nature of the opinion being offered by Mr. Fleisher (e.g. is he testifying with respect to human factors, design, or both)?

2. What are Mr. Fleisher's qualifications to offer a human factors opinion?

3. Would Mr. Fleisher's conclusions pass muster under recognized methodologies within his field of practice?

4. Does not the field of engineering contemplate some scientific methodology? [17]

5. Are there industry standards which address the design of walkways to and from commercial establishments?

6. Are there general human factors studies which address the propensities refereed to by Mr. Fleisher, i.e., the tendency of pedestrians to cut corners?

With respect to Question 1, Mr. Fleisher confirmed that his opinion implicated "human factors as it is applied by engineers in their design work on an ordinary basis." [18] In essence, he testified that engineers should design structures, including sidewalks, with an understanding and anticipation of how the structure will be used.[19] This, he explained, is the application of human factors to engineering.[20]

In response to Question 2, Mr. Fleisher testified that he is not a "human factors" engineer; he is a civil engineer.[21] There was no separate curriculum for human factors when Mr. Fleisher studied engineering.[22] Nevertheless, he explained that "human factors is an essential application to civil engineering and to structural engineering in construction, and as to the design and evaluation of walkway sur-

---

**15.** *Shoney's I*, supra, Letter Op. at 3.

**16.** This approach differed from the approach suggested by Judge Quillen in *Shoney's I*. There, Judge Quillen stated that a pretrial hearing was not his preference. Rather, he preferred to resolve questions regarding the admissibility of Mr. Fleisher's opinion at trial. *Shoney's I*, supra, Letter Op. at 3. While this is certainly an appropriate approach and, at times, perhaps the only available approach given the Court's often overwhelming docket, this judge prefers to resolve *Daubert* issues in advance of trial when practicable.

**17.** *Websters'* defines "engineering" as "the putting of scientific knowledge in various branches to practical uses." *Websters' New World Dictionary of the American Language*, at 204 (2d Ed.1974).

**18.** Fleisher Depo. at 135 (Jan. 24, 2002).

**19.** *Id.* at 136.

**20.** *Id.* at 135–37.

**21.** *Id.* at 135.

**22.** *Id.* at 136.

faces."[23] According to Mr. Fleisher, his training and experience as a civil engineer qualify him to offer opinions with respect to human factors engineering.[24]

Addressing his methodology (in response to Question 3), Mr. Fleisher testified that his experience with other "perpendicular hard walkway surfaces" which intersect into a corner is that people regularly will "cut the corner."[25] He pointed to "wear patterns" he has observed in grassy areas adjacent to the "corner junction" of walkways designed without a concrete "diagonal" to round out the corner.[26] While his answer to Question 3 (and the follow up questions) were quite long, the essence of Mr. Fleisher's testimony was that the "methodology" he employed in this case was personal observation and experience.[27]

Asked whether "engineering" involved "scientific methodology" (Question 4), Mr. Fleisher replied that the observation of past human behavior when confronted with certain walkway patterns, and the application of those experiences to a given walkway design, did implicate "scientific methodology."[28] He acknowledged, however, that he was unaware of any studies, scientific or otherwise, that document this well-known phenomenon of human behavior, i.e., when given the opportunity, pedestrians will leave a designated walkway to "cut the corner."[29]

In response to Question 5, Mr. Fleisher testified that there were potentially applicable industry standards.[30] He went on to explain, however, that none of the standards addresses the propensities of pedestrians to "cut corners."[31] Instead, the one standard he specifically identified addresses tripping hazards in general, both for "able" pedestrians and "disabled" pedestrians.[32] If there are other applicable standards, Mr. Fleisher did not identify or discuss them.

Mr. Fleisher was unaware of any "human factors studies" which address the propensity of pedestrians to cut corners (Question 6).[33] Interestingly, Mr. Fleisher is the chairman of the subcommittee of the American Society for Testing Materials ("ASTM") which has promulgated standards regarding tripping hazards.[34] Yet his ASTM subcommittee has done nothing to promulgate standards or guidelines governing the tripping hazard purportedly caused by the failure to design a walkway which will accommodate our propensity to cut corners.[35] Mr. Fleisher had been involved in this case for nearly three years at the time he gave his deposition.[36]

## III.  DISCUSSION

### A.  The *Daubert* Analysis

"No one will deny that the law should in some way effectively use expert knowledge

23.  *Id.*

24.  *Id.*

25.  *Id.* at 145.

26.  *Id.*

27.  *Id.* at 147–48.

28.  *Id.* at 148–49.

29.  *Id.* at 149.

30.  *Id.* at 169–71.

31.  *Id.* at 171.

32.  *Id.* at 172.

33.  *Id.* at 151.

34.  *Id.* at 152–53.

35.  *Id.*

36.  *Id.* at 154.

wherever it will aid in settling disputes."[37] Nevertheless, as Judge Quillen has observed,

> [O]ur scepticism of such compensated advocacy is high and we no longer rest on the mere proper credentials of the expert witnesses or even on being satisfied as to the general relevancy of the expert's opinion. The basis of the opinion must have "good grounds" when judged by experts in the same general field as the witness. The Trial Judge must determine whether the reasoning and methodology is valid by the professional standards of the scientific, professional, or business field of the expert. And the Trial Judge must determine whether the expert's reasoning or methodology can be applied to the facts at issue. The burden is a heavy one and one that will tax even the best Trial Judges, a hearty breed who pride themselves as decision-making pragmatists in the field of battle. But there can be no question that the burden has been imposed.[38]

■ The "burden" to which my predecessor referred is the Court's obligation to act as "gatekeeper" each time a party to litigation seeks to make or bolster its case with the testimony of a witness purportedly expert in a field relevant to the controversy.[39] The progression of Delaware law setting forth the parameters of this "gatekeeping" responsibility, and the requisite judicial dissection of expert testimony necessary to discharge the responsibility, has been well documented by Delaware courts and will not be repeated at length again here.[40] Suffice it to say, a motion *in limine* challenging the admissibility of expert testimony implicates the review process mandated by *Daubert.*

■ Boiled down to its essence, *Daubert* requires the Court to answer two fundamental questions before admitting expert testimony: (1) is the testimony relevant?; and (2) is the testimony reliable?[41] The party offering the testimony bears the burden of establishing both prongs of the *Daubert* analysis, i.e., relevancy *and* reliability, by a preponderance of the evidence.[42]

The Court need look no further than the Delaware Uniform Rules of Evidence for guidance on the question of relevancy. D.R.E. 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." D.R.E. 702 requires that expert testimony be ad-

---

**37.** Learned Hand, *Historical and Practical Considerations Regarding Expert Testimony,* 15 Harv. L.Rev. 40 (1901).

**38.** *Minner v. American Mortg. & Guar. Co.,* 791 A.2d 826, 846 (Del.Super.2000).

**39.** *See Daubert* 509 U.S. at 579, 589 n. 7, 113 S.Ct. 2786 (1993)(the United States Supreme Court's seminal decision announcing the trial court's responsibilities under the Federal Rules of Evidence to scrutinize the qualifications, methodology, and ultimate conclusions of the expert and characterizing this exercise as the court's "gatekeeping" function). *See also* D.R.E. 104(a)(identical to its Federal counterpart, this rule requires the Court to determine preliminarily such matters as the

"qualification of a person to be a witness" and "the admissibility of evidence...").

**40.** *See e.g. M.G. Bancorporation, Inc. v. Le Beau,* 737 A.2d 513, 521–22 (Del.1999)(applying *Daubert* to non-scientific expert testimony); *Crowhorn v. Boyle,* 793 A.2d 422, 427–431 (Del.Super.2002)(tracing the history of Delaware's approach to the admissibility of expert testimony); *Minner,* 791 A.2d at 833–46(tracing the history of American jurisprudence regarding the admissibility of expert testimony).

**41.** *Id.* at 843.

**42.** *Id.*

mitted only if it "will assist the trier of fact to understand the evidence or to determine a fact in issue." While other rules of evidence may be implicated by the relevancy prong of the *Daubert* analysis,[43] D.R.E. 401 and 702 are at its heart.[44]

■■■ D.R.E. 702 also injects a "reliability" component into the admissibility analysis. The "reliability" of the expert's opinion obviously depends, in part, upon his competency within his field, i.e., the expert must be qualified to render the opinions he intends to offer at trial.[45] In addition, by referring specifically to "scientific, technical or other specialized knowledge," D.R.E. 702 implicitly requires "a grounding [of the opinion] in the methodology and procedures" of the proffered expert's specialized discipline.[46] And the reference to "knowledge" in D.R.E. 702 "connotes more than subjective belief or unsupported speculation."[47]

■■■ Certain factors may guide the Court's analysis of the "reliability" of the expert's testimony including "testing, peer review, error rates, and 'acceptability' in the relevant scientific community."[48] These factors, however, are neither exclusive nor exhaustive. The Rule 702 review is a "flexible one;"[49] the "gatekeeping inquiry must be 'tied to the facts' of a particular 'case.'"[50] Regardless of its ingredients, the key to the "reliability" inquiry is to ensure that "an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."[51]

## B. The *Daubert* Hearing

■■■ *Daubert* instructs: "[when] [f]aced with a proffer of expert [ ] testimony, then, the Trial Judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to: (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact at issue."[52] "And, with that statement, the so-called *Daubert* hearing was born."[53] *Daubert* did not, however, lay the parameters for the evidentiary process it had created. Confusion among

---

**43.** For instance, D.R.E. 403 requires the Court to consider the likelihood of prejudice or confusion before admitting otherwise relevant evidence. The D.R.E. 403 "balancing test" applies with no less force when considering the admissibility of expert evidence as compared to any other type or character of evidence. *See Gannett Co. v. Kanaga,* 750 A.2d 1174, 1187 (Del.2000)("A[n][ ] analysis under Rule 703 is not a substitute for a hearsay ruling or a balancing exercise under Rule 403").

**44.** *Daubert,* 509 U.S. at 591, 113 S.Ct. 2786 (interpreting the identical Federal counterpart to D.R.E. 702). *See also* 4 Weinstein & Berger *Weinstein's Federal Evidence,* § 702.03[1] at 702–33 (2d Ed.2002)("The helpfulness requirement of Rule 702 is, thus, akin to the relevance requirement of Rule 401, which is applicable to all proffered evidence").

**45.** *Nelson v. State,* 628 A.2d 69, 73–74 (Del. 1993).

**46.** *Daubert,* 509 U.S. at 590, 113 S.Ct. 2786.

**47.** *Id.*

**48.** *M.G. Bancorporation, Inc.,* 737 A.2d at 521 (quoting *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (citation omitted)).

**49.** *Kumho Tire Co., Ltd.,* 526 U.S. at 150, 119 S.Ct. 1167(quoting *Daubert,* 509 U.S. at 594, 113 S.Ct. 2786).

**50.** *Id.*

**51.** *Id.* at 152, 119 S.Ct. 1167.

**52.** *Daubert,* 509 U.S. at 592, 113 S.Ct. 2786; *Minner,* 791 A.2d at 843.

**53.** *Minner,* 791 A.2d at 844.

the circuits followed. It was not until *Kumho Tire* that the Court definitively addressed whether a full evidentiary hearing is required before the Court can adequately perform its gatekeeping function. It is not.[54] A full evidentiary hearing must be conducted only if "special circumstances" warrant.[55] Otherwise, it is sufficient if the Court considers the expert's report, the expert's deposition testimony, and any supporting affidavits.[56]

Here, the Court offered to conduct a *Daubert* hearing but the parties declined the invitation. Instead, the parties suggested that a further deposition be taken of Mr. Fleisher to consider the issues enumerated by the Court in its December 10, 2001 letter to counsel. The supplemental deposition was taken on January 24, 2002 and submitted to the Court on March 11, 2002.[57] Mr. Fleisher was asked to respond to the issues identified by the Court as well as further questions from counsel regarding his qualifications and methodology. The Court is satisfied that this process was more than adequate to facilitate the Court's gatekeeping responsibility.[58]

### C. Relevancy

■ Shoney's has not argued that Mr. Fleisher's testimony, if admitted, would not tend to make the existence of a fact "of consequence" more probable.[59] Mr. Fleisher opined, based on his engineering experience, that Shoney's should have designed its walkway in anticipation of a known tendency of pedestrians to cut corners. This opinion goes to the heart of plaintiff's negligence claim and is obviously relevant under D.R.E. 401. Instead, Shoney's relevancy argument relies upon D.R.E. 702's requirement that the expert's opinion "assist the trier of fact to understand the evidence or to determine a fact in issue."

■ "That a witness has knowledge, skill, expertise or training does not necessarily mean that the witness can assist the trier of fact."[60] Some courts have held that "[w]hen the jury is equally competent to form an opinion about the ultimate fact issues or the expert's testimony is within the common knowledge of the jury, the trial court should exclude the expert's testimony."[61]

Professor Weinstein explains that a split has developed among the United States Circuit Courts of Appeal regarding the extent to which an expert may testify

---

54. *Kumho Tire*, 526 U.S. at 152, 119 S.Ct. 1167 ("we conclude that the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable").

55. *Minner*, 791 A.2d at 846.

56. *Id.*

57. (D.I.69, Ex. A)

58. *See Minner*, 791 A.2d at 846 (nearly identical process employed).

59. *See* D.R.E. 401.

60. *K–Mart Corp. v. Honeycutt*, 24 S.W.3d 357, 360 (Tex.2000)(excluding human factors testimony).

61. *Id. See also Getter v. Wal–Mart Stores, Inc.*, 66 F.3d 1119, 1124 (10th Cir.1995)(jury could draw its own conclusions about safety of floor based on lay testimony of eyewitnesses and, therefore, could not be assisted by expert testimony); *Salas v. Carpenter*, 980 F.2d 299, 305 (5th Cir.1992)(proffered expert must bring more to the finder of fact than the lawyer can offer in closing argument); *Scott v. Sears, Roebuck & Co.*, 789 F.2d 1052, 1055 (4th Cir.1986)("Rule 702 makes inadmissible expert testimony as to a matter which obviously is within the common knowledge of jurors because such testimony, almost by definition, can be of no assistance").

about matters which fall within the realm of common knowledge and common sense.[62] He suggests that the better-reasoned view is to "admit the testimony if there is any chance at all that it will be beneficial to the finder of fact." [63] Stated differently, "doubts about whether an expert's testimony will be useful should generally be resolved in favor of admissibility." [64] The line of cases to which Professor Weinstein refers draws its strength from the "liberal thrust" of the Federal Rules of Evidence which take a "general approach [to relax] the traditional barriers to 'opinion' testimony." [65]

At first glance, Mr. Fleisher's opinion would appear to encompass matters of common sense and common knowledge well within the grasp of lay jurors. He opines that when given the opportunity, pedestrians will take "short cuts" to get to their destination more quickly, even if they must depart from designated walkways to do so. Jurors necessarily are pedestrians ("able" or "disabled").[66] If pedestrians are prone to cut corners, jurors know of this propensity as well as any expert. But Mr. Fleisher's opinion extends beyond this general observation of human behavior. He opines that Shoney's should have designed its walkway and landscaping in a manner which would accommodate this behavior and that it failed to do so in this

instance. If properly supported, this opinion arguably is beyond lay understanding such that expert guidance is appropriate. Adopting a liberal view of relevancy and "helpfulness," as endorsed by *Daubert* and Professor Weinstein, the Court finds that Mr. Fleisher's opinion passes through *Daubert's* first admissibility filter (albeit somewhat diluted): the opinion is relevant.

### D. Reliability

#### 1. Mr. Fleisher's Qualifications

██ Mr. Fleisher acknowledges that he has received no special education or training in the field of human factors engineering. He does not consider himself to be a human factors engineer; he is licensed as a "civil engineer." Yet he regularly confronts human factors issues in his work and suggests they are integral to any engineer's design work. The Court is satisfied that Mr. Fleisher is competent to offer opinions in human factors engineering based on his extensive work experience designing structures with their intended and expected use in mind.[67]

#### 2. Mr. Fleisher's Opinion Implicates Both Science and "Technical Knowledge"

██ To determine if Mr. Fleisher's proffered testimony is reliable, the Court

---

**62.** 4 Weinstein & Berger *Weinstein's Federal Evidence*, § 702.03[2][b] at 702–35–36 (2d ed.2002).

**63.** *Id.* at § 702.03[2][c] at 702–37 (citing *Finch v. Hercules, Inc.*, 941 F.Supp. 1395, 1417 (D.Del.1996)("a lay juror could have a 'general sense about the ages at which persons commonly retire,'" but "a better informed lay juror is one who has his or her 'general sense' augmented with facts and data" provided by an expert witness)).

**64.** *In re Japanese Electronic Products Antitrust Litig.*, 723 F.2d 238, 279 (3d Cir.1983), *rev'd on other grounds sub nom, Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). *See also United States v. Downing*, 753 F.2d 1224, 1241 (3d Cir.1985)(holding that F.R.E. 702 establishes "a presumption of helpfulness" in favor of expert testimony).

**65.** *Daubert*, 509 U.S. at 588–89, 113 S.Ct. 2786.

**66.** Mr. Fleisher's terms.

**67.** *See In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir.1994)(recognizing liberal qualification standards for expert witnesses extend to substantive experience as well as formal qualifications).

must first focus on exactly what science or technical experience forms his "expert" opinions. Mr. Fleisher admits that his opinions are based in the study of human factors, and that this discipline implicates principles of science and engineering, as well as other disciplines. Mr. Fleisher's characterization of human factors is consistent with the characterization utilized by one of the largest societies of human factors professionals. The website for the International Ergonomics[68] Association ("IEA") states that "ergonomics... (or human factors) is the **scientific discipline** concerned with the understanding of interactions among humans and other elements of our system, and the profession that applies theory, principles, data and methods to design in order to optimize human well-being and overall system performance."[69]

It is believed the discipline first surfaced during World War II as control panels for weaponry and aircraft became increasingly complex and difficult to manage in the field of battle.[70] The goal of the human factors engineer was to simplify the controls while retaining the original design features of the equipment.[71] The human factors engineers initially compiled empirical data based on controlled laboratory and field studies in the context of user tendencies with military equipment, but it was later discovered that these studies had much broader utility. Not surprisingly, after the war, the work of the military's human factors engineers was offered to industry to be incorporated in the design of commercial products.[72] By the 1970's, human factors was incorporated in the design of virtually every product category.[73]

Courts have characterized human factors as "scientific knowledge."[74] This distinction does not direct the Court's standard of review—*Daubert* clearly applies to scientific and non-scientific expert testimony alike[75]—but it does suggest that some methodology will be utilized by the expert who purports to draw on the principles encompassed within the discipline to form his opinions.[76] Even if the Court ignored the "science tag" that Mr. Fleisher himself placed on his work in this case,[77] and the characterization of the discipline by one of the largest human factors professional societies, the Court would be left

68. " 'Ergonomics' is the name used in European countries for the study of human factors. Human factors engineering and ergonomics are synonymous, and an 'ergonomist' is, for all intents and purposes, a human factors engineer." Robert B. Yules, *Human–Factors Experts in Products Liability Litigation*, 9 J. Prod. Liab. 107, 111 n. 6 (1986).

69. *www.iea.cc/index* (Emphasis supplied)

70. Yules, 9 J. Prod. Liab. at 110–11.

71. *Id.*

72. 3B Louis R. Frumer & Melvin I. Friedman, *Products Liability*, § 99.01[1] (1992).

73. *Id.*

74. *E.g. Hart–Albin Co. v. McLees, Inc.*, 264 Mont. 1, 870 P.2d 51, 56 (1994).

75. *Kumho Tire*, 526 U.S. at 137, 119 S.Ct. 1167.

76. See *www.iea.cc/ergonomics/* ("human factors is [a] *scientific* discipline ... that applies theory, principles, data and *methods...* ")(emphasis supplied) See also *Daubert*, 509 U.S. at 590, 113 S.Ct. 2786 ("the adjective 'scientific' implies a grounding in the methods and procedures of science"); *Pfizer, Inc. v. Advanced Monobloc Corp.*, 1999 WL 743927, at *3, 1999 Del.Super. LEXIS 330, at *12 ("*Daubert* does not create a test where the expert opinion must have the best foundation, but rather, whether any particular opinion is based on valid reasoning and methodology") (citation omitted).

77. Fleisher Depo. at 148–49 (Jan. 24, 2002)

with an opinion from an expert who proffered his "technical knowledge" as being helpful to the jury. And "[technical] 'knowledge' connotes more than subjective belief or unsupported speculation." [78] Under either scenario, there can be no doubt that an expert's opinion that relies solely upon the *ipse dixit* of the expert cannot pass through the evidentiary gate. [79]

█ Mr. Fleisher has acknowledged that his methodology amounted to no more than drawing upon his "practical knowledge." [80] He did not refer to specific industry standards, studies, guidelines, regulations, scholarly works, or peer reviewed information of any kind. While it is true that published works need not form the basis of the expert's opinion, [81] the absence of such foundation "is one factor in determining whether an expert's opinion is based on good grounds." [82] Not only did Mr. Fleisher decline to cite objective information in support of his opinion, he also declined to provide even anecdotal support. He mentioned nothing of other cases or incidents which support the contention that Shoney's should have known

that Ms. Ward would walk through its landscaping and trip over the edging. [83] And, perhaps most importantly, Mr. Fleisher could point to nothing other than his "say so" to support the notion that the design of the walkway was flawed, or that the landscaping was a dangerous condition of which Shoney's should have been aware. [84]

█ The Court must reject plaintiff's argument that cross-examination will place Mr. Fleisher's opinions in proper context. While it is true that cross-examination can, in certain instances, effectively expose a weak expert opinion, the cross-examination of an expert whose opinion is based solely on his subjective belief is tantamount to wasted breath. Under these circumstances, the skilled expert witness is virtually untouchable on cross-examination. Accordingly, before the Court will allow a "shaky" expert opinion to pass through the courtroom "gate" on the expectation that cross-examination will serve as an equalizer, the Court should be satisfied that cross-examination can be "vigorous." [85] Vigorous cross examination simply is not

---

78. *Daubert*, 509 U.S. at 590, 113 S.Ct. 2786.

79. *Minner*, 791 A.2d at 851 (citing *General Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997)).

80. Fleisher Depo. at 159–60 (Jan. 24, 2002).

81. *See Daubert*, 509 U.S. at 593, 113 S.Ct. 2786 ("publication (which is but one element of peer review) is not a *sine qua non* of admissibility; it does not necessarily correlate with reliability").

82. *Minner*, 791 A.2d at 850, n. 29 (citation omitted).

83. Indeed, Mr. Fleisher testified that engineers "learn from mistakes that have been made in the past." Fleisher Depo. at 147 (Jan. 24, 2002). Yet he failed to mention any "past mistake" known either to experts in his

field generally, or to Shoney's in particular, which would or should have guided the proper design of this walkway. This sort of anecdotal information may well have been adequate to ground his opinion in reliable foundation.

84. Mr. Fleisher's reference to the study entitled "Pedestrian Falling Accidents in Transit Terminals" misses the mark. This study simply addressed the ground clearance necessary to enable a pedestrian to walk normally without tripping. Fleisher Depo. at 102–04 (June 14, 1999). The study says nothing of requisite design criteria to avoid tripping hazards in general, or walkway design specifically. *Id.*

85. *See Daubert*, 509 U.S. at 595–96, 113 S.Ct. 2786 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence")(emphasis supplied).

possible when neither counsel, the Court, nor the expert himself can discern a process or method by which the expert's opinion was generated.

The methodology employed by Mr. Fleisher (which amounted to no methodology at all) is inadequate to permit his opinion to be presented to the jury. The opinion cannot pass through *Daubert's* second admissibility filter: the opinion is not reliable. In the face of this record, the Court cannot abrogate its responsibility to act as gatekeeper; it has no choice but to exclude Mr. Fleisher's testimony.

As a final thought, the Court returns to the concern that prompted this lengthy (perhaps too lengthy) opinion: if more than the expert's "say so" is required, will human factors experts ever be permitted to testify in a Delaware courtroom? From this judge's perspective, the answer to this question is: "it depends. . . ." If the opinion is based simply upon the *ipse dixit* of the expert, and that is all the human factors experts are able to muster in support of their opinions, they will find a gatekeeper unwilling to admit them into the courtroom. If, on the other hand, the human factors expert is able to demonstrate some reliable methodology at the heart of his opinion, the gate will be opened and the opinion will be admitted in evidence (subject, of course, to admissibility under other applicable rules of evidence). The Court is satisfied that process and methodology are not foreign to the human factors expert, even when he addresses the peculiarities of human behavior.[86] Accordingly, the Court is confident that this opinion will not

be misconstrued as a broad attack on the discipline of human factors engineering, or as a blanket exclusion of these experts from Delaware litigation. Neither consequence is intended or justified.

### E.  Summary Judgment

In *Shoney's I*, Judge Quillen ruled that plaintiff cannot make a *prima facie* case of negligence absent competent expert testimony.[87] The Court already has determined that this ruling is the "law of the case" and reiterates that conclusion here.[88] "The law of the case doctrine, like the *stare decisis* doctrine, is founded on the principle of stability and respect for court processes and precedent."[89] The Court may ignore the law of the case only in instances where the prior decision was "clearly erroneous" or its continued application would produce an "unjust result."[90] Neither exception applies here.

### IV.  *CONCLUSION*

Based on the foregoing, Shoney's motion *in limine* is **GRANTED**. Mr. Fleisher's opinions are not reliable and, therefore, not admissible. Consequently, in view of the law of the case, and the absence of competent expert support for plaintiff's claim, Shoney's motion for summary judgment must be **GRANTED** as well.

**IT IS SO ORDERED.**

---

86.  *See www.iea.cc/ergonomics* (describing a discipline which applies "theory, principles, data, and methods"); Fruman & Friedman, *Products Liability*, supra, at § 99.01[1](describing methodology of human factors engineering).

87.  *Shoney's I,* supra, Letter Op. at 2.

88.  (D.I. 65 at 2)

89.  *Gannett Co., Inc. v. Kanaga*, 750 A.2d 1174, 1181 (Del.2000).

90.  *Id.* at 1182.