James M. CROWHORN and Judy A. Crowhorn, Plaintiffs.

v.

Matthew C. BOYLE, a minor, and Michael P. Boyle, Defendants.

C.A. No. 00C–02–032–JRJ.

Superior Court of Delaware, New Castle County.

Date Submitted: Jan. 2, 2002.

Bench Ruling Issued: Jan. 2, 2002.

Written Opinion Issued: March 14, 2002.

Roger D. Landon, Esquire and John S. Spadaro, Esquire, Murphy, Spadaro & Landon, P.A., Wilmington, Delaware, for Plaintiffs.

Thomas S. Bouchelle, Esquire, Bouchelle & Palmer, Newark, Delaware, for Defendants.

## MEMORANDUM OPINION

JURDEN, J.

After issuing a bench ruling on January 2, 2002 on Plaintiff's Motion to Exclude Dr. Riederman's Causation Opinions at Trial, the Court issues the following written opinion:

### Background

In this personal injury action, plaintiff James Crowhorn seeks recovery for low back and other injuries sustained in a March 8, 1999 automobile collision.

On August 10, 1999, and October 10, 2000, Crowhorn submitted to medical examinations conducted by Robert Riederman, M.D., an orthopedic surgeon. These

examinations were required by Crowhorn's Personal Injury Protection insurer, who also insures defendant Michael Boyle.

### Dr. Riederman's Discovery Deposition

On July 10, 2001, Crowhorn's counsel took a discovery deposition of Dr. Riederman. Dr. Riederman admitted that the mechanism of Crowhorn's injury is consistent with his complaints following the accident.[1] Dr. Riederman then went on to opine that six weeks post-accident this "consistency" disappeared and any complaints after six weeks are not related to the collision:

Q: And when did the complaints change over time and become no longer consistent with injuries that would have been caused by the accident?

A: Well, that's where "within a reasonable degree of medical probability" comes into play. Within a reasonable degree of medical probability, symptoms from a muscle ligament/soft tissue type of injury would resolve following a course of treatment. Four weeks, six weeks is a reasonable course of treatment.... When a certain period of time lapses, I would expect that patient to get better.... So when I saw this patient... I did not feel that his symptoms were related to the accident that had happened five months before.[2]

According to Dr. Riederman, because "the vast majority of patients" suffering from soft tissue injury to the low back heal within six weeks, Crowhorn's complaints after the six week mark cannot be causally related to the collision.[3]

When Crowhorn's counsel asked Dr. Riederman the basis for his opinion that the "vast majority of patients" with soft tissue injury to the low back heal within six weeks, Dr. Riederman responded:

Q: I cannot give you a number, but I would say patients with a herniated disk, an anatomically-documented herniated disk, the studies show 75 to 80 percent of them are better within six weeks.[4]

Crowhorn's counsel points out that Crowhorn has never been diagnosed with a herniated disk and does not seek recovery for a herniated disk. Moreover, Dr. Riederman's written reports concerning his examinations of Crowhorn make no mention whatsoever of a herniated disk.

When Crowhorn's counsel asked Dr. Riederman to name one study supporting this causation opinion, Dr. Riederman was unable to do so.[5] In fact, during his discovery deposition, Dr. Riederman could not identify by name, source or author any studies which support his causation opinion, and the unidentified studies referenced above relate to an injury both parties agree Crowhorn does not have.

### Identification of the Studies Following the Discovery Deposition

After Dr. Riederman's discovery deposition, Crowhorn's counsel asked defense counsel to make expedited production of the unidentified studies relied upon by Dr. Riederman in rendering his causation opinion. In his October 18, 2001 letter, Crowhorn's counsel specifically noted his intention to file a motion in limine to exclude Dr. Riederman's causation opinion

---

1. Deposition of Robert Riederman, M.D. taken July 10, 2001, at 62. (Hereinafter referred to as "Discovery Dep. at ___"). This opinion is hereinafter referred to as the "causation opinion."

2. *Id* at 62–63.

3. *Id.* at 63.

4. *Id.* at 63–64.

5. *Id.* at 64.

under *Daubert.*[6] Defense counsel responded on October 30, 2001, indicating that he had requested copies of the studies from Dr. Riederman, and would produce them upon receipt.

On November 27, 2001, over a month after Crowhorn's counsel requested the studies, and only four business days before Dr. Riederman's trial deposition, defense counsel identified by title and citation the studies relied upon by Dr. Riederman in rendering his causation opinion at this discovery deposition.

### Dr. Riederman's Trial Deposition

On December 4, 2001, Dr. Riederman's trial deposition went forward on a conditional basis pending briefing and decision on the instant motion in limine. During his trial deposition, Dr. Riederman, consistent with his discovery deposition, again testified that Crowhorn's current complaints are probably unrelated to the collision because most sufferers of similar injuries heal within six weeks post-accident:[7]

Q: And your conclusion on Mr. Crowhorn is that because the majority of people get better with low back problems in six weeks, he must be in that majority?

A: I am asked to answer within a reasonable degree of medical probability, and within a reasonable degree of medical probability, somebody who sustains this type of acute back injury in March of '99 would be expected to be better within six weeks.[8]

According to Dr. Riederman, because the majority of people with low back pain get better in six weeks, it is reasonably probable that Crowhorn got better in six weeks. This assumes, of course, that (a) it is *true* that the majority of people with low back pain *do* get better in six weeks, and (b) Crowhorn is properly lumped in with "the vast majority."

Dr. Riederman testified during his trial deposition that while he believes the collision is not the cause of any the injuries Crowhorn had or still has *after* six weeks post-accident, he lacks the ability to opine to a reasonable degree of medical probability as to what the actual cause is.[9] At the same time, Dr. Riederman admits that Crowhorn was asymptomatic before the collision, that he became symptomatic "when he was injured in 1999," and that his complaints remained constant at all times from the collision through the date of his first exam by Dr. Riederman in August 1999.[10]

### The Studies Purportedly Supportive of Dr. Riederman's Causation Opinion

Although, during his discovery deposition, Dr. Riederman purportedly relied on certain studies for the proposition that seventy-five to eighty percent of those who suffer from chronic low back pain heal within six weeks,[11] none of the studies he identified following his discovery deposition offer any support for his causation opinion. These studies are discussed in greater detail below. With respect to one

6. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)

7. Trial Deposition of Robert Riederman, M.D., taken December 4, 2001, at 21–22, 31, 41, 63, 65 and 115. (Hereinafter "Tr. Dep. at ___.").

8. Tr. Dep. at 115.

9. Tr. Dep. at 31.

10. *Id.* at 38–40.

11. Discovery Dep. at 63–64.

of the studies, Dr. Riederman admitted during his trial deposition:

> I would state that the summary of this paper that you have read does not support and does conflict with the opinions that I have stated in my reports.[12]

After Crowhorn's counsel established during Dr. Riederman's trial deposition that none of the studies provided by Dr. Riederman support his causation opinion, Dr. Riederman claimed that there are "other studies" that support his opinion.[13] Notably Dr. Riederman did not identify any of these "other studies."[14]

### Waddell Testing

In his trial deposition, another of the bases Dr. Riederman offered to support his causation opinion was "non-anatomic" findings. This basis, like the studies, fails to support his causation opinion. Although Dr. Riederman testified in his discovery deposition that he does not use Waddell signs,[15] at his trial deposition Dr. Riederman testified he administered Waddell tests to Crowhorn during the first defense medical exam, and that the Waddell tests revealed non-anatomic findings which support his causation opinion.[16] While Dr. Riederman purported in his trial deposition to rely on Waddell testing (and behavioral signs generally), he admitted to using Waddell tests on Crowhorn in a way that Waddell and his colleagues proscribe. Waddell acknowledges that these behavioral tests (for "nonorganic" signs) are widely used "in medicolegal assessment."[17] Their typical use, he says, is as a tool to develop "evidence of malingering."[18] However, as plaintiffs point out, clinical studies show that the signs often appear in patients with no motive toward malingering—that is, those not involved in anything like a litigation setting, but who nonetheless seek clinical treatment.[19] This is particularly true, notes Waddell, "in patients with chronic pain and a history of failed treatment."[20] Waddell explains that positive reactions to "behavioral" tests (like the Waddell tests) do not indicate the absence of physical pathology:

> Physical pathology and nonorganic reactions are discrete but frequently interaction dimensions; they are not alternative diagnoses.... [21]

As plaintiffs correctly point out, the suggestion that positive Waddell signs should be "interpreted as evidence of simulated incapacity for the purpose of financial gain" has been rejected as invalid.[22] Instead, positive nonorganic signs have been shown to reflect fear responses, learned responses and other factors:

**12.** Tr. Dep. at 109.

**13.** Tr. Dep. at 109.

**14.** *Id.*

**15.** In 1980, Dr. Gordon Waddell and others developed a "standardized assessment of behavioral responses to [physical] examination"—This assessment is commonly referred to as "Waddell testing" or "Waddell signs." Chris J. Main & Gordon Waddell, *Behavioral Responses to Examination: A Reappraisal of the Interpretation of "Nonorganic Signs,"* 23 SPINE 23 67 (1998). *See* Plaintiffs' Supplemental Submission in Support of Their Motion in Limine to Exclude Dr. Riederman's Causation Opinions at Trial, at Ex. B (Hereinafter "Pl. Supp. Sub. at ___").

**16.** Trial Dep. at 76–77.

**17.** Pl. Supp. Sub. at Ex. B at 2367.

**18.** *Id.*

**19.** *Id.*

**20.** *Id.*

**21.** Pl. Supp. Sub. at Ex. B at 2368.

**22.** *Id.*

[S]oft tissue injury may have led to the development of chronic incapacity through a variety of mechanisms, such as... specific fears of hurting, harming, or reinjury. If pain has persisted, it may have led to the development of a disuse syndrome characterized by avoidance of painful movements or activities.

\* \* \* \* \* \*

Specific memories and expectations of painful examinations may produce inconsistencies in presentation as a result of fear.[23]

Waddell also notes that "patients with low back pain may have other problems."[24] Neck pain, for example, may need to be considered as an alternative explanation "for behaviors elicited in the context of an assessment of low back pain."[25] Crowhorn suffered injuries to his back and neck in the March 1999 collision.

According to Waddell, the worst abuse of behavioral signs "has occurred in medicolegal contexts."[26] In those contexts, Waddell points out, positive behavioral signs are often assumed (in the first instance) to rule out physical pathology. According to Waddell, unless the examiner has taken steps to rule out the primary source of positive behavioral signs—the "learned responses to pain that have developed since the original injury and of which the patient is largely unaware"—these positive signs must be viewed as nothing more than the typical incidents of "pain behavior."[27] According to plaintiffs, Wad-

dell makes clear that positive behavioral signs (like the ones Dr. Riederman now claims to have found in Mr. Crowhorn) "are not a reason to deny appropriate physical treatment."[28] They should be used "to decide not whether to offer treatment, but the type of treatment to offer."[29] They are "not on their own a test of credibility or veracity." And where, as here, the examining physician fails to rule out other recognized sources, "the signs should be viewed as an indicator of pain behavior."[30]

It appears from a review of the clinical literature submitted in support of plaintiffs' motion that Dr. Riederman used results of Waddell testing in a way that they are not intended to be used. It is important to note that Dr. Riederman adhered to his opinion that Waddell's signs are proof of malingering even when confronted with Dr. Waddell's assertion to the contrary.[31]

*Discussion*

Under Delaware Rule of Evidence 702, expert testimony is admissible provided that the expert is qualified to testify by virtue of his or her "knowledge, skill, experience, training or education" and the scientific, technical or other specialized information "will assist the trier of fact to understand the evidence or to determine a fact in issue...."[32] D.R.E. 702 is identical to its federal counterpart, F.R.E. 702,

23. *Id.* at 2369.

24. *Id.*

25. *Id.*

26. Pl. Supp. Sub. at Ex. B at 2370.

27. *Id.*

28. Pl. Supp. Sub. at Ex. B at 2370.

29. *Id.*

30. *Id.* at 2370.

31. Tr. Dep. at 82. This contradicts Dr. Riederman's prior testimony that, "I don't have the ability to look at an individual patient and say they're a faker." *See* Discovery Dep. at 66.

32. D.R.E. 702.

which was interpreted by the United States Supreme Court in *Daubert v. Merrell Dow Pharm., Inc.*[33] The Delaware Supreme Court has adopted this interpretation.[34]

*Daubert's* predecessor was the "general acceptance" or *Frye* test, which made its debut in a 1923 decision from the Court of Appeals for the District of Columbia. In deciding whether to admit evidence stemming from a systolic blood pressure deception test, that Court ruled the evidence as inadmissible because it had "not yet gained such standing and scientific recognition among physiological and psychological authorities as would justify the courts in admitting expert testimony deduced from the discovery, development, and experiments thus far made...."[35] Until *Daubert*, the *Frye* test remained alive and well notwithstanding the fact that F.R.E. 702, adopted in 1976, made no mention of a "general acceptance" requirement for the admissibility of expert testimony. The rule provides as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.[36]

In *Daubert*, the plaintiffs were minor children born with significant birth defects. Their mothers had ingested the antiemetic medication, Bendectin, during their respective pregnancies. The plaintiffs alleged that Bendectin caused their congenital teratogenic defects. The defendant pharmaceutical company contested this theory of causation and moved for summary judgment on the issue. It supported its motion with an affidavit of a respected and highly credentialed physician/epidemiologist who, after conducting an extensive review of all of the literature and studies on the subject, concluded that the use of Bendectin during the first trimester of pregnancy was not causally related to birth defects. The plaintiffs attempted to admit conflicting testimony from eight experts who concluded that Bendectin did, in fact, cause birth defects. However, these experts did not express their opinions based on epidemiological data. Rather, the plaintiffs' experts relied on *in vivo* and *in vitro* animal studies establishing the teratogenic effect of Bendectin as well as the "re-analysis" of previously published epidemiological studies. Reyling on *Frye*, the District Court held that, to be admissible, scientific evidence must be based upon a principle that is "sufficiently established to have general acceptance in the field to which it belongs."[37] The Court granted Summary Judgment for the defendant because the plaintiffs' experts did not base their opinions on methods generally accepted in the scientific community. The United States Court of Appeals for the Ninth Circuit affirmed.[38] The United States Supreme Court granted *certiorari*, vacated the decision of the Ninth Circuit Court of Appeals, and held that the *Frye* test was superseded by the adoption of the Federal Rules of

**33.** 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

**34.** *M.G. Bancorporation, Inc. v. Le Beau*, 737 A.2d 513 (Del.1999).

**35.** *Frye v. United States*, 293 F. 1013, 1014 (1923).

**36.** F.R.E. 702.

**37.** *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 727 F.Supp. 570 (D.S.Cal.1989).

**38.** 951 F.2d 1128 (9th Cir.1991).

Evidence.[39] The Supreme Court further held that nothing in the language of the rule or its drafting history mentions the "general acceptance" test, and found that "a rigid 'general acceptance' requirement would be at odds with the 'liberal thrust' of the Federal Rules and their 'general approach of relaxing the traditional barriers to 'opinion testimony.'" [40]

In *Daubert*, the Court held that inquiries under Rule 702 should be flexible. "Its overarching subject is the scientific validity and thus the evidentiary relevance and reliability of—of the principles that underlie a proposed submission. The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." [41] To determine whether the expert's testimony will assist the trier of fact, the Court must consider the following:

(1) Is the reasoning or methodology underlying the opinion scientifically valid?

(2) Can that reasoning or methodology be properly applied to the facts at issue?

(3) Has the theory or technique been tested, subject to peer review and publication?

(4) Is it generally accepted? [42]

With respect to the last consideration, a "reliability assessment does not require, although it does permit, explicit identification of a relevant scientific community and an express determination of a particular degree of acceptance within that community." [43]

*Daubert* involved the admissibility of *scientific* expert testimony. The holding was silent with respect to its applicability to other forms of expert testimony. Consequently, the various Courts of Appeal differed in their decisions on this point. The Supreme Court, in *Kumho Tire Co., Ltd. v. Carmichael*,[44] clarified this issue by stating that the *Daubert* decision applies to *all* types of expert testimony. According to the Supreme Court:

> *Daubert's* general holding—setting forth the trial judge's general 'gatekeeping' obligation—applies not only to testimony based on 'scientific knowledge,' but also to testimony based on 'technical' and 'other specialized' knowledge. We also conclude that a trial court may consider one or more of the more specific factors that *Daubert* mentioned when doing so will help determine that testimony's reliability. But, as the Court stated in *Daubert*, the test of reliability is 'flexible,' and *Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case. Rather, the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination.[45]

■■■ It is the trial judge who determines issues of admissibility of expert testimony. The *Daubert* factors for determining questions of admissibility are meant to be helpful, but are not definitive.[46] "The trial judge must have consid-

**39.** *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

**40.** *Daubert*, 509 U.S. at 597, 113 S.Ct. 2786 (*citing Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 109 S.Ct. 439, 102 L.Ed.2d 445 (1988)).

**41.** *Id.* at 594–95, 113 S.Ct. 2786.

**42.** *Id.* at 593–94, 113 S.Ct. 2786.

**43.** *Id.*

**44.** 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

**45.** *Kumho*, 526 U.S. at 137, 119 S.Ct. 1167.

**46.** *Kumho*, 526 U.S. at 151, 119 S.Ct. 1167.

erable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." [47] A trial judge's decision to admit or exclude expert testimony is reviewed under an abuse of discretion standard.[48]

While the *Daubert* holding was not officially adopted in Delaware until recently, a similar test was nonetheless applied before its adoption. In *Nelson v. State*,[49] a five-part test was utilized to determine the admissibility of expert scientific testimony:

(1) Is the witness qualified as an expert by knowledge, skill, experience, training or education?

(2) Is the evidence relevant and reliable?

(3) Is the expert's opinion based upon information reasonably relied upon by the experts in the particular field?

(4) Will the specialized knowledge being offered assist the trier of fact to understand the evidence or determine a fact in issue? [50] and

(5) Will the expert testimony create unfair prejudice or confuse or mislead the jury?

In *M.G. Bancorporation, Inc. v. Le Beau*,[51] the Delaware Supreme Court adopted the *Daubert* and *Kumho* holdings as the official interpretation of Delaware Rule of Evidence 702. In that case, the Court reviewed a Chancery Court decision involving the admissibility of conflicting expert testimony on the issue of the valuation of a corporate merger. The Court of Chancery rejected an expert's capital market approach because it was not generally accepted in the financial community and contained an inherent minority discount that was legally impermissible in statutory appraisal proceedings. The Supreme Court affirmed the lower court's decision, citing both *Daubert* and *Kumho:*

> Delaware Rule of Evidence 702, like its federal counterpart, 'establishes a standard of evidentiary reliability.' Delaware Rule of Evidence 702 'requires a valid... connection to the pertinent inquiry as a precondition to admissibility.' When the 'factual basis, data, principles, methods, or their applications in an expert's opinion are challenged, the trial judge must decide if the expert's testimony 'has a reliable basis in the knowledge and experience of [the relevant] discipline." [52]

Two recent Delaware Superior Court cases have relied upon the *Le Beau* decision. In *State v. Steen*,[53] the Court upheld the testimony of a medical doctor who testified on behalf of a worker's compensation claimant. In *Steen* the Court stressed that the *Daubert* factors were not exhaustive. Rather, the Rule 702 inquiry is intended to flexible and the trial judge has broad discretion to determine whether the *Daubert* factors are the appropriate measure of reliability in a given case.[54]

In *Pfizer v. Advanced Monobloc Corp*,[55] the Court was presented with numerous motions in limine seeking to limit expert testimony. The Court in *Pfizer* noted:

**47.** *Id.* at 152, 119 S.Ct. 1167.

**48.** *Id. (citing General Electric Co. v. Joiner*, 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997)).

**49.** 628 A.2d 69 (Del.1993).

**50.** *Id.* at 73–74.

**51.** 737 A.2d 513, 522 (Del.1999).

**52.** *Id.* at 522 (citations omitted).

**53.** 1999 WL 743326 (Del.Supr.)

**54.** *Id.* at *3.

**55.** 1999 WL 743927 (Del.Supr.)

The *Daubert* gate-keeping requirement is to ensure the reliability and relevancy of expert testimony and the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable. Additionally, the factor test mentioned in *Daubert* does not constitute a "definitive checklist or test" for the trial court in the admissibility of an expert opinion. *Daubert* does not create a test where the expert opinion must have the best foundation, but rather, whether any particular opinion is based on valid reasoning and reliable methodology.

Relying on *Daubert* and *Kumho*, the Court in *Pfizer* excluded expert testimony establishing the value of twenty years worth of lost sales to *Pfizer*. While this expert was qualified to analyze marketing decisions, the Court concluded that there was no reliable basis for the expert's testimony on lost sales valuation. A second expert's testimony was also excluded because it was based, in part, on the first expert's projections and, thus, was deemed unreliable. The Court held, "[w]hile an expert has historically been allowed to testify to an assumed set of factual circumstances, if the assumed facts are unsupported, then the subsequent expert should not be allowed to testify as to its accuracy." [56]

■ Applying *Daubert* to Dr. Riederman's testimony, the Court concludes that Dr. Riederman's opinions on causation do not pass muster. The Court finds that the methodology underlying his causation opinion is not supported by scientific data and is factually flawed. Dr. Riederman testified that Crowhorn's collision-related injuries must have healed within six weeks, because he claims studies (identified after his discovery deposition) show similar injuries healing within that time frame. The studies he cites in no way support his claim.

One of the "studies" is a U.S. Department of Health and Human Services publication titled *Acute Lower Back Problems in Adults.*[57] The Abstract and Executive Summary sections of this publication make clear that its findings are limited to cases of short-term, acute back injury, as opposed to chronic back injury:

Findings and recommendations on the assessment and treatment of adults with acute low back problems—activity limitations due to symptoms in the low back and/or back-related leg symptoms of less than 3 months' duration—are presented in this clinical practice guideline.

\* \* \* \* \* \*

The panel defined back problems as activity intolerance due to back-related symptoms and [defined] acute as limitations of less than 3 months' duration.[58]

By definition, this Department of Health publication is expressly limited to people whose symptoms resolved in less than three months. This study does not support any opinions regarding the course of healing for persons with chronic back injury (*i.e.*, injuries that remain symptomatic *after* three months).[59] It is inconceivable

---

56. *Id.* at *6.

57. Plaintiffs' Motion to Exclude Dr. Riederman's causation opinions at Trial Ex. H. (Hereinafter "Pl. Mot. at ___").

58. *Id.* at 4, 7 (quoting from Abstract and Executive Summary).

59. Dr. Riederman agrees, meanwhile, that Mr. Crowhorn remained symptomatic many months after the March 1999 collision. Tr. Dep. at 66–67 (agreeing that Mr. Crowhorn still had subjective complaints of pain five months after the collision).

to the Court how this study supports Dr. Riederman's opinion that Crowhorn's injuries from the collision must have healed within six weeks. The plain language of the study makes clear it does not pertain to chronic low back injuries:

> The panel agreed further that the assessment and treatment of patients who have chronic low back problems (with symptoms lasting over 3 months) may be quite different than for patients with acute problems.... For these reasons, the panel decided that chronic low back problems are beyond the scope of guideline of acute problems.[60]

Another study relied upon by Dr. Riederman is Michael Von Korff & Kathleen Saunders, *The Course of Back Pain in Primary Care*, 21 SPINE 2833 (1996) According to Dr. Riederman, this source supports the opinion that the "vast majority" of back pain sufferers "get better" within six weeks of injury. A review of this publication reveals it does not support such a conclusion:

> Sixty-six percent to 75% continue to experience at least mild back pain 1 month after seeking care. At 1 month, approximately 33% report continuing pain of at least moderate intensity, whereas 20–25% report substancial activity limitations. For the long-term follow-up (1 year or more) period, approximately 33% report intermittent or persistent pain of at least moderate intensity, one in seven continue to report back pain of severe intensity, and one in five report substantial activity limitations.[61]

This publication indicates that large numbers of back pain sufferers continue to suffer more than one year post-injury, yet Dr. Riederman somehow construes this as support for his opinion that Crowhorn must have healed within six weeks' time.

The next "study" on which Dr. Riederman relies is Hans J.M. van den Hoogen et. al., The Prognosis of Low Back Pain in General Practice, 22 SPINE 1515 (1997).[62] Like the sources discussed above, this study does not suggest most people with low back pain heal in six weeks. In fact, contrary to Dr. Riederman's interpretation, it concludes that thirty-five percent of the study population still suffered low back pain after *twelve weeks*, and that many still suffered after the passage of a full year.[63]

Another source relied upon by Dr. Riederman is Alf L. Nachemson, *Advances in Low–Back Pain*, 200 CLINICAL ORTHOPAEDICS AND RELATED RESEARCH 266 (1985).[64] This source points to a study showing "that within six weeks nearly 90% [of those studied] were back to work."[65] The Court notes, however, that returning to work is not the same as being healed or asymptomatic; and that, indeed, injured people return to work out of monetary necessity while still symptomatic. More important, this study plainly states:

> [w]hen it comes to the chronic low-back-pain patients, there hardly exists any single, properly randomized study demonstrating positive effects of any type of treatment.... [66]

As the plaintiffs correctly point out, if the patient's return to work is viewed as a "positive effect" of treatment, then it is

60. Pl. Mot. at Ex. H. (quoting from "Scope and Organization" section).

61. Pl. Mot. at Ex. I at 1 (quoting from "Results" section of Abstract).

62. Pl. Mot. at Ex. J.

63. *Id.* at 1.

64. Pl. Mot. at Ex. K.

65. Pl. Mot. at Ex. K at 270.

66. *Id.*

clear that the author's earlier reference to those returning to work "within six weeks" is a reference to acute sufferers; and that this reference is offered by way of contrast to the discussion of "chronic low-back-pain patients" that follows almost immediately. In any event, this publication, like the others, does not remotely suggest that most sufferers of chronic low back pain heal in six weeks.

■ *Daubert* requires that the expert's reasoning be both scientifically valid and applicable to the facts of the case.[67] The Court finds neither is the case here. It is overwhelmingly clear that Dr. Riederman's opinion on causation does not come close to being the product of a scientifically valid methodology or applicable to the facts at hand. While Dr. Riederman agrees that the mechanism of injury is consistent with Crowhorn's post-accident complaints of low back pain,[68] he contends that the causal connection stopped at six weeks.[69] According to Dr. Riederman, he is somehow able to opine to a reasonable probability that the healing point for Crowhorn, who he has examined on only two occasions, is six weeks—not five, not seven, but six. From six weeks on, he insists, Crowhorn's pain is no longer caused by the collision, but instead is caused by degenerative changes.[70] This opinion is *ipse dixit*. Dr. Riederman renders this opinion notwithstanding the fact that he does not dispute that Crowhorn suffered continuous low back pain over the course of five months, from the date of the collision to the first exam, and that during that five-month period, Crowhorn's symptoms did not change.

Even if peer-reviewed sources existed to support Dr. Riederman's proposition that

seventy-five percent of chronic back pain sufferers "get better" in six weeks (and there is no evidence in the record suggesting they do), that fact would have no application to Crowhorn because Dr. Riederman offers no basis for placing Crowhorn among the seventy-five percent of quick healers, as opposed to the twenty-five percent who suffer longer. Dr. Riederman himself begrudgingly acknowledges this:

Q: * * *Are you saying those 25 percent are all fakers, that they're not having low back pain after the six weeks of therapy?

A: I don't have the ability to look at an individual patient and say they're a faker. I don't assume that power.

\*   \*   \*   \*   \*   \*

Q: Well, can we agree at least for purposes of what we're talking about here that Mr. Crowhorn who you see five months or so after the accident has been through this therapy, it's been more than six weeks since the accident, he's still complaining subjectively of low back pain; correct?

A: Correct.

Q: So he'd be in this group of 25 percent that don't get better after the therapy?

A: He continues to complain.[71]

As plaintiffs correctly point out, for that part of the population in the twenty-five percent, the probability that their injury will last beyond six weeks is not twenty-five percent, but *one hundred percent*.

Dr. Riederman's opinion on causation cannot withstand *Daubert* scrutiny. It is premised on misinterpretations of clinical

---

67. *Daubert*, 509 U.S. at 593, 113 S.Ct. 2786.

68. Tr. Dep. at 62.

69. *Id.* at 62–63.

70. *Id.* at 60–67.

71. Discovery. Dep. at 66–67.

studies, a scientifically insupportable methodology, and a misinterpretation of Waddell signs. Moreover, the studies and Waddell testing which he claims support his causation opinion are simply inapplicable to the facts at issue.

For the reasons stated above, Plaintiff's Motion to Exclude Dr. Riederman's Causation Opinions at Trial is GRANTED.

IT IS SO ORDERED.